IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:19-cv-0476

| | |
|---|---|
| EPIC GAMES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **COMPLAINT** |
| ) | |
| RONALD SYKES, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| ) | |

Plaintiff, Epic Games, Inc. ("Epic" or "Plaintiff") complains of Defendant Ronald Sykes, aka "@Snipa_King2k," aka "@FNGzus," aka "@invisiblellama9" ("Sykes" or "Defendant"), as follows:

## INTRODUCTION

1.      A trade secret is information that is valuable because it is secret.  If it loses its secrecy, it loses its value.  A secret can no longer surprise those to whom it has already been disclosed.

2.      Epic is suing Sykes because he broke his contractual obligation to keep Epic's secrets about the upcoming season of Fortnite®, Epic's popular video game.  Information is currency.  Sykes cashed in on what he learned as a User Experience tester for Epic.  He did so at the expense of Epic and those in the Fortnite community who were anxiously awaiting the new season of Fortnite only to have some of Epic's planned surprises spoiled by Sykes' leaks.

3.      Sykes attempted to "give the game away" by leaking Epic's secrets and spoiling the suspense that Epic had been working to generate and build for months in the run up to Fortnite Chapter 2.  His disclosure of Epic's trade secrets materially breached his non-disclosure

agreement with Epic to maintain those secrets in strict confidence and betrayed the trust of the people at Epic with whom he worked.

4.      Fortnite is the product of a multidisciplinary team of hundreds of developers, designers, engineers, marketers, and other creative and business people who use art, science, imagination, skill, and hard work to create and continually improve the game. Their primary objective is that Fortnite's players and audience remain engaged and entertained.

5.      The significant changes that came in Fortnite Chapter 2 were the result of considerable planning, creativity, and effort by Epic's employees.  In advance of the new season, Epic left hints and hidden "Easter eggs" in the game, and published "teasers" outside of it, all so Fortnite fans would feel excitement about what was to come.

6.      Unauthorized disclosure of trade secrets undermines the incentive to create and innovate because it demoralizes those who work on a game over many months, only to have the fruits of their labor soured by someone they held in a position of trust.

7.      Sykes' spoilers did just what the word itself suggests: they diminished the anticipation of what was to come and the joy of looking forward to it.  They detracted from the pleasure that the Fortnite community takes from the game because they deprived some of its members of the thrill that comes from the element of surprise and the delight of experiencing that surprise and the planned "reveal" all together at the same time.

8.      Defendant's conduct is damaging to Epic in many ways.  Just as leaked secrets can generate significant traffic and revenue to the benefit of those who publish them, those leaks are destructive to the owner of the leaked material.

9.      Leaks negatively impact the financial performance of current and future versions of the game. They tend to lessen the excitement and enthusiasm of a game's players and audience, potentially leading them to move to other games.

2

10.     Sykes' conduct constitutes misappropriation of Epic's trade secrets and breach of the terms of the non-disclosure agreement to which he agreed in order to have access to the trade secrets he stole and publicly disclosed, damaging Epic and spoiling the enjoyment of many of Fortnite's players and fans.

## NATURE OF ACTION

11.     This is a civil action seeking injunctive relief and damages against Defendant for (i) misappropriation of trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq.* (the "DTSA"); (ii) misappropriation of trade secrets in violation of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-152, *et seq.* (the "NCTSPA"); and (iii) breach of contract in violation of North Carolina law.

12.     Trade secrets are a form of intellectual property that provides legal protection for commercially valuable business and technical information that: (a) has been the subject of reasonable efforts to maintain its secrecy and (b) derives independent economic value from not being generally known or readily ascertainable. Both the federal DTSA and the State NCTSPA protect trade secrets from "misappropriation," which is the unauthorized acquisition, use, or disclosure of a trade secret.

13.     One way trade secret owners protect their trade secrets while disclosing them to others is through non-disclosure agreements ("NDAs"). NDAs are contracts that allow trade secret owners to entrust others with confidential and proprietary information, including trade secrets, while maintaining the security and integrity of the information and the confidence that neither its secrecy nor its value will be compromised or destroyed because it was shared. Sharing protected information in this way encourages and promotes collaboration, experimentation, and the continued development and improvement of the protected material.

PPAB 5190537v6.docx

14. This is a breach of contract and misappropriation of trade secrets action in which Defendant, after having signed an NDA as a condition to being granted access to Epic's secrets, leaked those secrets about the then-upcoming season (and second chapter) of Epic's video game, Fortnite. In so doing, Defendant misappropriated Epic's closely-guarded trade secrets with which he had been entrusted while working as a user experience tester at Epic and violated his NDA.

## THE PARTIES

15. Epic is a corporation duly organized and existing under the laws of the State of Maryland. Epic is registered to do business in North Carolina and has its principal place of business in Wake County, North Carolina.

16. On information and belief, Defendant Ronald Sykes is a citizen of North Carolina and resides in Durham, North Carolina.

## JURISDICTION AND VENUE

17. This Court has jurisdiction over the subject matter of Plaintiff's federal claims under 28 U.S.C. § 1331 and 18 U.S.C. § 1836(c) because this action arises under the DTSA, 18 U.S.C. §§ 1832, *et seq*. This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a).

18. This Court has personal jurisdiction over Sykes under N.C. Gen. Stat. § 1-75.4(1) because he is a natural person domiciled within this State and because, as described below, he consented to the exclusive jurisdiction of courts located in this State. This Court also has personal jurisdiction over Sykes because he purposefully availed himself of the privileges of conducting activities and doing business in the State of North Carolina and in this District, thus invoking the benefits and protections of North Carolina's laws.

19.     Venue is proper in this District under 28 U.S.C. § 1391(b) because this is a District in which a substantial part of the events giving rise to Plaintiff's claims occurred, and where a substantial part of the property that is the subject of this action was conceived, created, and is situated.  It is also where Sykes committed acts of trade secret misappropriation and breached his contract, which was entered into in this District and is governed by North Carolina law, and where Plaintiff's injuries were suffered.

## FACTS APPLICABLE TO ALL CLAIMS

### *Epic and Fortnite*

20.     Founded in 1991, Epic is a Cary, North Carolina-based developer and publisher of video games, a game engine, and suite of content creation tools and software.  Epic is recognized worldwide as the creator of its Unreal® technology and the Unreal®, Gears of War®, and Infinity Blade® series of games.[1]  Today, Epic is perhaps best known as the creator, developer, and publisher of Fortnite.

21.     Fortnite's first game mode, now known as "Fortnite: Save the World," is a co-op survival and building action player vs. environment (PvE) game in which players may join together online to build forts, weapons, and traps in an effort to rebuild and defend towns left vacant in the wake of "the Storm" from the monsters that populate this Fortnite world.  It was released broadly on July 25, 2017.

22.     Two months later, on September 26, 2017, Fortnite's free-to-play "Battle Royale" game mode was released to the public.  Like other games in the battle royale genre, Fortnite Battle Royale involves dropping (in Fortnite, by glider from a flying "battle bus") a limited

---

[1] The trademark registration symbol is used the first time each registered mark is used herein but not again after that.

number of players into a large map[2]. Fortnite Battle Royale combines Fortnite's building skills and destructible environments with intense player vs. player (PvP) combat. (A true and correct screen print from the Fortnite page on Epic's website (available at: https://www.epicgames.com/fortnite/en-US/home) [hyperlink removed], which provides a glimpse of a few of the new map locations and points of interest that make up part of Fortnite Chapter 2's new map is pictured below:



23.     When players land on the island, they scavenge the various items – e.g., weapons and consumables such as ammunition, shield potion, bandages, medical kits, and building materials – they will need to survive, outlast, and defeat the other 99 players on the island.

24.     As the game goes on, the encroaching storm shrinks the habitable part of the map, forcing surviving players closer and closer together. The players battle each other until the last player or team remains standing. That player or team wins the game.

---

[2] In Fortnite as in other video games, the "map" is the bounded area in which players may play the game.

25.     In little more than two years, the Fortnite community has grown to over 250 million accounts, and sometimes has more than 8 million concurrent players.

26.     In addition to the tens of millions of people who play Fortnite, millions of others watch "streamers" broadcast (or "stream") Fortnite gameplay on various platforms, including YouTube and Twitch, Amazon's popular online service for watching and streaming digital video, where Fortnite is reportedly one of the most-viewed games.

27.     An important part of Fortnite's dramatic success is the unexpected changes and surprises Fortnite's fans experience as the game, its story, and its environment continually evolve. This, along with the regular introduction of new content, including, without limitation, planned events; playing formats; themes; narratives; storylines; plot twists and developments; player capabilities; "emotes" (i.e., dances or gestures a player's avatar can perform); cosmetics (e.g., outfits aka "skins" for player avatars); weapons; vehicles; "Easter eggs;" new map locations, points of interest (POIs) and other environmental changes; and other secrets and surprises, have kept Fortnite's millions of users excited about and engaged with the game.

28.     Anticipation in the Fortnite community about what would happen next in Fortnite was perhaps at an all-time high at the end of the tenth season of Fortnite ("Season X"). Speculation in the Fortnite community was rampant that an entirely new map might replace the one where Fortnite Battle Royale had taken place since it was first introduced two years earlier.

29.     Players pointed to a new metal structure that appeared in the game on top of one of the warehouses in "Dusty Depot," inside of which a rocket was being built. A clock had appeared above the rocket counting down as a warning signal blared.  The countdown was set to end on October 13, 2019.



30. Outside of the game, at 2:00pm Eastern Time on October 11, 2019, on social media Epic tweeted "The End is near" telling the Fortnite community that "The End" would come in "48 hours . . ."



PPAB 5190537v6.docx

31.     When the countdown ended at 2:00pm on Sunday, October 13, 2019, millions of people watched the Season X season-ending event, which culminated with the entire then-known Fortnite world collapsing in upon itself.  Nothing was left but a black hole which replaced the game along with Epic's website, social media, and Twitch channel for the following 40 or so hours.



32.     "The End" broke viewership records on both Twitter and Twitch and was one of the most viewed gaming events ever on YouTube. More than 1.7 million people watched Fortnite being streamed on Twitch, the most ever concurrent viewers of a single game on that platform.  It was also the most viewed gaming event ever on Twitter, with 50.7 million minutes watched and 42.8 million views, peaking at 1.4 million concurrent viewers. On YouTube, viewership reached 4.3 million concurrent viewers across various streams.[3]

---

[3] *See* Nick Statt, *Fortnite's black hole event broke Twitch and Twitter viewing records*, The Verge, Oct. 23, 2019 https://www.theverge.com/2019/10/23/20929589/fortnite-black-hole-event-season-11-viewers-twitch-twitter-youtube-live [hyperlink removed]; Gene Park, *Behold the massive social media explosion from Fortnite's Season 10 finale*, Washington Post, Oct. 23, 2019,  https://www.washingtonpost.com/video-games/2019/10/23/behold-massive-social-media-explosion-fortnites-season-finale/ [hyperlink removed].

PPAB 5190537v6.docx

33.     The following day, Monday October 14, 2019, viewership for Fortnite on Twitch and YouTube remained extraordinarily high – reportedly in the millions of hours – even though the black hole was the only live Fortnite-related visual that streamers could broadcast.   On information and belief, millions of viewers and others in the Fortnite community were eagerly awaiting and anticipating what would happen next in Fortnite.

### *Epic's Trade Secrets*

34.     Epic is the owner of all right, title, and interest in and to the Fortnite-related trade secrets at issue in this case, including, proprietary, secret, and confidential business and technical information and data related to Fortnite.   For the purposes of this action, this specifically includes planned changes to the game's map and environment, (i.e., the new map itself and new map locations, points of interest, environmental features, such as rivers and the mountains shown on the picture of the map Defendant disclosed and otherwise described in the text of his tweets); new player capabilities (i.e., the ability to swim); new game features (i.e., weapon upgrade stations); a new vehicle (i.e., boats); a new weapon (i.e., bandage bazooka); new rules and reward system (i.e., Daily Medals awarded for searching chests, getting kills, and surviving); and new gameplay[4] (i.e., new ways to get more powerful weapons and move around the new map by swimming and using boats in the riverways) (collectively with the trade secrets specifically described in paragraphs 58 and 59 of this Complaint, "Epic's Trade Secrets").

35.     At the time of Sykes' unauthorized disclosures, Epic's Trade Secrets derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of Epic's Trade Secrets.

---

[4] In this context, "gameplay" means the strategic aspects of the game, its plot, and the way it is played as dictated by the new map and other changes described herein.

36.     At the time of Sykes' unauthorized disclosures, Epic's Trade Secrets were the subject of efforts reasonable under the circumstances to maintain their secrecy.

37.     At all relevant times, Epic has taken reasonable measures to keep Epic's Trade Secrets secret by, including, without limitation: (i) maintaining them in secure working spaces; (ii) requiring a fully executed NDA for each person who might have access to Epic's Trade Secrets; (iii) limiting access to Epic's Trade Secrets to only those who are working on Fortnite, are product testers, or are part of senior management; (iv) requiring (a) an assigned Epic user name, (b) password (with leading-edge industry standards for password requirements), and (c) multifactor authentication to access the computer system in which Epic's Trade Secret-related files are stored and/or live-streamed meetings during which Epic's Trade Secrets might be discussed or disclosed; and (v) encrypting files that Fortnite users download in order to be able to play the game to prevent "data miners" from accessing the information.

### *Sykes' NDA*

38.     On September 21, 2019, Sykes participated in Epic's User Experience Testing ("UX Testing") at Epic's headquarters in Cary, North Carolina.  UX Testing allows the testers access to versions of Fortnite that are still in development in exchange for their feedback and promise that they will keep what they learn secret.  The purpose of UX Testing is to help Epic's developers improve Fortnite.

39.     Because participation in UX Testing involves access to Epic's confidential and proprietary information and trade secrets, Sykes was required to sign, and did sign in writing, a non-disclosure agreement on September 21, 2019 ("his NDA" or "Sykes' NDA"), before he participated in the UX Testing.

40.     By signing his NDA, Sykes acknowledged that during UX Testing he might see, hear, be told, learn, obtain, and otherwise have access to proprietary, secret, and confidential

11

information and data, including confidential information and trade secrets related to Epic's games (collectively "Confidential Information").

41.    By signing his NDA, Sykes agreed to keep Epic's Confidential Information in strict confidence and not to use or disclose any of Epic's Confidential Information.

42.    By signing his NDA, Sykes agreed that any disclosure by him of any of Epic's Confidential Information outside of Epic would cause significant harm and damage Epic's business.

43.    By signing his NDA, Sykes agreed that, unless permitted otherwise in writing, he would not photograph or otherwise record any information, including Epic's Confidential Information, to which he might have access during UX Testing.

44.    By signing his NDA, Sykes acknowledged and agreed that were he to breach his obligations relating Epic's Confidential Information, Epic would have the right to pursue injunctive relief because legal remedies would be inadequate.

45.    By signing this NDA, Sykes acknowledged and agreed North Carolina law governed his NDA and that the courts of competent jurisdiction over disputes arising from or related to the NDA are in North Carolina.

46.    Sykes' NDA is a valid and binding agreement between Epic and Sykes.

47.    Epic has performed all of its obligations under Sykes' NDA.

48.    Sykes' conduct described herein breaches the terms of his NDA.

49.    As a direct result of Sykes' breaches of his NDA, Epic has been, and will continue to be, harmed by Sykes' bad acts and is entitled to injunctive relief and monetary damages.

<u>***Defendant and His Unlawful Acts***</u>

50.     Three days later – on September 24, 2019 – a Twitter user who styled himself "King Snipa" and used the handle "@snipa_king2K" wrote to another Twitter user, "I played S11[5] and can tell you the new stuff," and asked the other user to "dm" (i.e. send a private "direct message") to him for information about the new season:



51.     On information and belief, @snipa_king2K is Defendant Sykes.

52.     On September 28, 2019, a Twitter user using the handle "@xDriFtZz" referred to the next season of Fortnite and claimed, "I played it, and season 11 is it!":

[*this space intentionally left blank*]

---

[5] On information and belief, "S11" is a reference to "Season 11" or what was then used to refer to the upcoming season of Fortnite. Season X ended at approximately 2:10pm on October 13, 2019. Early in the morning of October 15, 2019, the new season – now known as "Chapter 2, Season 1" – began. Prior to October 15, 2019, most Fortnite fans, players, and the media referred to the upcoming season as "Season 11." In this complaint, Epic refers to the season that began on October 15 as "Season 11," "Chapter 2," or "Chapter 2, Season 1," as the context dictates, but they are all one and the same.

13



53.     On information and belief, @xDriFtZz is Defendant Sykes.

54.     On October 3, 2019, @xDriFtZz tweeted, "bro you can swim season 11 just chill lol, season 11 will be great":



PPAB 5190537v6.docx

55.     On October 5, 2019, a Twitter user going by the handle "@FNGzus" proclaimed himself "FortNews Gawd" and the "#1 Fortnite leaker," and began posting a series of highly detailed leaks about the upcoming season of Fortnite and posted an image of the as yet undisclosed "Season 11" map.  (True and correct screen-prints of this Twitter feed are copied below and attached hereto collectively as **Exhibit A**.)

56.     At that time, it was unclear when the season-ending event would occur, when the next season would begin, and what, if anything, would happen with the map.  But on or about October 5, 2019 at 12:18pm – nine days before it became public – @FNGzus "confirmed" what the new Season 11 map would be by posting the following picture:



(*See* Exhibit A at p. 3.)

57.     Then, beginning on or around 1:12pm on October 8, 2019, the same Twitter user unleashed a storm of 8 tweets in 7 minutes during which he revealed what he characterized as

"Insider Season 11 Leaks & Info," including a number of very specific details and (again) an image of Fortnite's new map, which he said came from an "anonymous source" that had "information on the Season 11 Map, NEW CONTENT and what to expect" in Fortnite during the new season. He also claimed that he had proof that this information came from "a reliable source that had an experience with the new season."

**FortNews Gawd 24/7 Leaks (FNGzus)** @FNGzus · Oct 8
Insider Season 11 Leaks & Info

An anonymous source reached out to me claiming they had information on the Season 11 Map, NEW CONTENT and what to expect. The user has proof that they are receiving this information from a reliable source that had an experience with the new season.

3

**FortNews Gawd 24/7 Leaks (FNGzus)** @FNGzus · Oct 8
Here is what I was told they saw & what we *COULD* expect to see in Season 11.

There will be Bots only game modes (recently mentioned by Epic in a Blog post)

Swimming Confirmed, Too detailed not to be in S11.
Rivers flow throughout the map making it the main movement strat.

1

**FortNews Gawd 24/7 Leaks (FNGzus)** @FNGzus · Oct 8
Mountain POI, Bottom right of the new map.
"The way to get purple / legendary guns now is you have to go to an upgrade station"
It take 100 mats of each to upgrade from blue to purple
250 of each to go form purple to orange

Brought back burst rifle, and unsilenced regular smg

1 1

**FortNews Gawd 24/7 Leaks (FNGzus)**
@FNGzus

No more heavy sniper***MAYBE***
Bazooka bandaid, shoots bandages to teammates
(Bandage version of chug splash basically)
Daily Medals - searching chests, getting kills, surviving give you medals



58.     In these tweets and in his October 3 tweet, Defendant disclosed that in the upcoming season of Fortnite: (i) the new vehicle would be boats; (ii) players would be able to swim; (iii) rivers would flow throughout the new map; (iv) there would be a new mountain POI in the bottom right hand corner of the map; (v) the way to get "legendary" weapons would be to go to an "upgrade station" and (vi) exchange certain amounts of each kind of building material

for an upgraded weapon; (vii) certain weapons would be vaulted and (viii) others would be un-vaulted; (ix) a new weapon, a bandage bazooka, could be used to increase health; (x) there would be new rewards and points systems; and (xi) there would be new caps on the amounts of building materials a player could hold.

59.     He also sent a second tweet in which he again disclosed the new map for Fortnite Season 11 – which would later become known as "Fortnite Chapter 2, Season 1" – stating that the picture he had sent out before is "100% the new map."



60.     The map disclosed by @FNGzus in the series of tweets dated October 5 and 8, 2019 is a substantially accurate reproduction of Fortnite's new Chapter 2, Season 1 map, and was not revealed by Epic to the public until October 15, 2019:

PPAB 5190537v6.docx

| Image of "Season 11" Map posted by Defendant on October 5 and 8, 2019 | Image of Fortnite Chapter 2, Season 1 Map (In-Game) |
|---|---|



61.     On or about October 8, 2019 at 4:22am, the same Twitter account that had been using the handle "@FNGzus" (but which is currently using the handle "@invisiblellama9") posted the image of the new map as a reply on the Twitter account of @Merl, a Fortnite streamer.  (A true and correct screen-print of this posting is attached hereto as **Exhibit B** at p. 1)

62.     The Confidential Information and Epic Trade Secrets disclosed by Sykes in his tweets of October 3, 5, and 8, 2019 include accurate descriptions of other new features and gameplay, which would not be revealed by Epic to the public until October 15, 2019.

63.     On or about October 14, 2019 at 9:52pm, the owner of the Twitter account that uses the handles "@FNGzus" and "@invisiblellama9" posted a video of himself scrolling through the tweet thread copied in paragraph 57, above as a reply to one of the tweets of the map he posted and to @Merl at 4:22am. (*See* Exhibit B, p.2)

64.     On information and belief, the Twitter account currently using the handle "@invisiblellama9" is the same account that previously used the handle "@FNGzus".

65.     On information and belief, the owner of this Twitter account and the person who controls it and uses the aliases "@FNGzus" and "@invisiblellama" is Defendant Ronald Sykes.

66.     Despite participating in Epic's UX Testing and signing an NDA on September 21, 2019, acknowledging that his nondisclosure obligations under his NDA lasted for several years from his last visit to Epic, Sykes waited just a few days before publicly breaching his nondisclosure obligations on Twitter.

67.     Over the three weeks following his visit to Epic's headquarters as its guest to participate in UX Testing, Sykes publicly revealed Epic Trade Secrets and Confidential Information comprised of or reflecting major changes to Fortnite's gameplay and its new map.

68.     Sykes' disclosure of Epic's Trade Secrets and Confidential Information constitutes misappropriation of trade secrets in violation of both the NCTSPA and the DTSA and violates the terms of Sykes' NDA.

69.     As a direct result of Sykes' breaches of his NDA and his violations of the NCTSPA and the DTSA, Epic has been, and will continue to be, harmed and is entitled to injunctive relief, compensatory damages, attorneys' fees, costs, and/or other equitable relief against Sykes.

# CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF
### (Breach of Contract)

70.     Epic re-alleges and incorporates fully by references the allegations in paragraphs 1 through 69 of this complaint, as if set forth fully herein.

71.     This is a claim for breach of contract under North Carolina law.

72.     As set forth above, Sykes entered into a binding, valid non-disclosure agreement with Epic, which was supported by adequate consideration, in which he agreed not to disclose Epic's Confidential Information and trade secrets.

73.     Sykes, through his disclosure of Epic's Confidential Information and Trade Secrets on Twitter and otherwise, (e.g., through direct messaging,) breached the terms of his NDA.

74.     As a direct result of Sykes' breach of his contractual obligations under his NDA, Epic has sustained and will continue to sustain damages in an amount to be determined.

75.     Sykes acknowledged in his NDA that if he breached his obligations relating to the use, dissemination, or disclosure of any Confidential Information, Epic would have the right to injunctive relief enjoining such acts because legal remedies would be inadequate.

76.     As a result of Sykes' breach of his NDA, Epic has suffered and is continuing to suffer irreparable injury. Epic cannot be adequately compensated for these injuries by monetary awards alone, and Epic has no adequate remedy at law for Sykes' breach. Epic is entitled to injunctive relief against Sykes, and to recover any damages proven to have been caused by reason of Sykes' breach.

77.     Under his NDA, Sykes agreed to indemnify, defend, and hold Epic harmless from any action, expense, and costs, including attorney's fees, resulting from his breach of his NDA.

78.     Thus, this Court should grant Epic its expenses and costs (including attorney's fees) related to this action.

## SECOND CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets under N.C. Gen. Stat. § 66-152, *et seq.*)

79.     Epic re-alleges and incorporates fully by reference the allegations in paragraphs 1 through 78 of this complaint, as if set forth fully herein.

80.     This is a claim for misappropriation of trade secrets under the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. §§ 66-153, *et seq.*

81.     Epic is the owner of Epic's Trade Secrets (as defined above), which are "trade secrets" under N.C. Gen. Stat. § 66-152(3) because, as described above, they are business and technical information that:

      a.  at all relevant times was the subject of reasonable efforts to maintain its secrecy; and

      b.  derived economic value and competitive advantage from not being generally known.

82.     Sykes was given access to Epic's Trade Secrets as part of his role as a User Experience tester.

83.     Sykes knew or should have known that Epic's Trade Secrets were trade secrets of Epic because, among other things, he agreed and acknowledged under his NDA that Epic would provide him with Confidential Information and trade secrets, specifically including information related to Epic's games.

84.     Sykes' NDA makes clear that Sykes is not authorized to disclose Epic's Trade Secrets to any person outside of Epic.

22

85.     Sykes nevertheless publicly disclosed Epic's Trade Secrets to those who follow

him on Twitter, others who saw his posts, and those to whom he sent Epic's Trade Secrets, all

without Epic's authorization or consent.

86.     Sykes' disclosure of Epic's Trade Secrets without Epic's express or implied

authority or consent constitutes misappropriation of Epic's Trade Secrets under N.C. Gen. Stat. §

66-152(1).

87.     On information and belief, Sykes' misappropriation resulted in economic loss to

Epic and/or unjust enrichment to Sykes, entitling Epic, pursuant to N.C. Gen. Stat. § 66-154(b),

to recover actual damages measured by Epic's economic loss, or Sykes' unjust enrichment

caused by the misappropriation, whichever is greater.

88.     As a result of Sykes' wrongful acts, Epic has suffered and is continuing to suffer

irreparable injury.  Epic cannot be adequately compensated for these injuries by monetary

awards alone and has no adequate remedy at law for Sykes' misappropriation of Epic's Trade

Secrets.  Thus, Epic is entitled to injunctive relief to prevent any future disclosure of its trade

secrets under N.C. Gen. Stat. § 66-154(a).

89.     Epic is also entitled to an award of punitive damages under N.C. Gen. Stat. § 66-

154(c) and § 1D-15 because Sykes' disclosure of Epic's Trade Secrets was willful and malicious,

egregious, and wrongful. Sykes knew that Epic's Trade Secrets were protected trade secrets,

which were the sole property of Epic and which Sykes had expressly agreed not to disclose. But

he did so anyway with conscious and intentional disregard for, and indifference to, Epic's rights,

knowing that the disclosure was reasonably likely to result in damage to Epic.

90.     For the same reasons, Epic is entitled to an award of attorney's fees under N.C.

Gen. Stat. § 66-154(d).

## THIRD CLAIM FOR RELIEF
### (Misappropriation of Trade Secrets under 18 U.S.C. § 1836, *et seq.*)

91.    Epic re-alleges and incorporates fully by reference the allegations in paragraphs 1 through 90 of this complaint, as if set forth fully herein.

92.    This is a claim for misappropriation of trade secrets under the Defend Trade Secrets Act of 2016, 18 U.S.C. §§ 1836, *et seq*.

93.    Epic is the owner of Epic's Trade Secrets (as defined above), which are "trade secrets" under 18 U.S.C. § 1839(3) because they are business and technical information that:

   a.   at all relevant times has been the subject of reasonable measures to keep such information secret; and

   b.   derives independent economic value, actual or potential, from not being generally known or readily ascertainable through proper means by another person who can obtain economic value from the disclosure or use of the information.

94.    Epic's Trade Secrets are intended to be used in, and some have been used in, interstate and foreign commerce as part of Fortnite.

95.    Epic has invested considerable time, effort, and financial resources to develop and protect Epic's Trade Secrets. Epic has treated Epic's Trade Secrets as secret and has protected them from unauthorized access by third parties. Epic's Trade Secrets give Epic an advantage over its competitors.

96.    As described in detail above, at all relevant times, Epic has taken reasonable measures to keep Epic's Trade Secrets secret.

97.    Sykes had access to and acquired Epic's Trade Secrets and other Confidential Information during his time at Epic under the terms and restrictions of his NDA.

24

98.     Sykes acquired Epic's Trade Secrets with knowledge that they are secrets he was contractually obligated not to disclose.  In breaching these obligations, Sykes acquired Epic's Trade Secrets by improper means as defined under 18 U.S.C. § 1839(6).

99.     Sykes misappropriated Epic's Trade Secrets by disclosing them publicly on Twitter and by other means without the express or implied consent of Epic to replicate, transmit, communicate, or convey them to others.

100.    As a result of this misappropriation, Sykes has proximately caused harm to Epic and is in a position to continue to injure Epic.

101.    On information and belief, Epic has incurred actual losses and/or Sykes has been unjustly enriched as a result of Sykes' misappropriation of Epic's Trade Secrets.

102.    To the extent Epic's injuries are compensable, Epic is entitled to (i) an award of its damages for actual loss caused by Sykes' misappropriation of Epic's Trade Secrets and (ii) for any unjust enrichment caused by Sykes' misappropriation of Epic's Trade Secrets that is not addressed in computing damages for actual loss, or, (iii) in lieu of damages measured by any other methods, the damages caused by Sykes' misappropriation measured by imposition of liability for a reasonable royalty for Sykes' unauthorized disclosure or use of Epic's Trade Secrets under 18 U.S.C. § 1836(b)(3)(B).

103.    As a result of Sykes' wrongful acts alleged herein, Epic has suffered and may be continuing to suffer irreparable injury.  Epic cannot be adequately compensated for these injuries by monetary awards alone, and Epic has no adequate remedy at law for Sykes' misappropriation of Epic's Trade Secrets. Epic is entitled to injunctive relief against Sykes, who should be preliminarily and permanently enjoined from further disclosing or using any of Epic's Confidential Information or trade secrets pursuant to 18 U.S.C. § 1836(b)(3)(A).

104.     Because Sykes' misappropriation of Epic's Trade Secrets was willful and malicious, Epic is entitled to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and, should Epic prevail in this matter, reasonable attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, Epic respectfully requests that the Court:

1.     Enter judgment in Epic's favor and against Sykes on all of Epic's claims;

2.     Find that Sykes breached his NDA;

3.     Find that Sykes misappropriated Epic's Trade Secrets under N.C. Gen. Stat. § 66-152, *et seq.*;

4.     Find that Sykes misappropriated Epic's Trade Secrets under 18 U.S.C. § 1836, *et seq.*;

5.     Find that Sykes' conduct was willful, malicious, egregious, and wrongful;

6.     Enter an order pursuant to N.C. Gen. Stat. § 66-154(a) that preliminarily and permanently enjoins Sykes by requiring (i) the destruction of all copies of Epic's Trade Secrets in his possession, custody, or control; and (ii) the removal of all copies of Epic's Trade Secrets from anywhere Sykes posted or published them, caused them to be posted or published, or otherwise made them available to third parties;

7.     Enter an order pursuant to N.C. Gen. Stat. § 66-154(a) and/or 18 U.S.C. § 1836(b)(3)(A)(i)-(iii) that preliminarily and permanently enjoins Sykes from disclosing or using any of Epic's other trade secrets;

8.     Enter an order requiring that Sykes pay Epic a sum certain reflecting the maximum amount of damages permitted under N.C. Gen. Stat. § 66-152, *et seq.* and/or 18 U.S.C. § 1836, *et seq.*;

9.     Enter an order that awards Epic its attorney's fees, costs, and expenses

under N.C. Gen. Stat. § 66-154(d), 18 U.S.C. § 1836(b)(3)(D), or Sykes' NDA;

10.　　Enter an order awarding Epic punitive damages under N.C. Gen. Stat. § 66-154(c) and N.C. Gen. Stat. § 1D-15; and

11.　　Award Epic such other and further relief as the Court deems just and proper.

This the <u>25th</u> day of October, 2019.

**PARKER POE ADAMS & BERNSTEIN LLP**

<u>/s/Christopher M. Thomas</u>
Christopher M. Thomas
N.C. Bar No. 31834
christhomas@parkerpoe.com
PNC Plaza
301 Fayetteville Street, Suite 1400 (27601)
P.O. Box 389
Raleigh, North Carolina 27602-0389
Telephone: (919) 828-0564
Facsimile: (919) 834-4564

*Attorney for Plaintiff Epic Games, Inc.*