*EPIC GAMES, INC.*
*v.*
*RONALD SYKES*
5:19-cv-476-FL

# EXHIBIT 1

# Proposed Final Judgment and Permanent Injunction on Consent

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
Civil Action No.: 5:19-cv-0476-FL

| | |
|---|---|
| EPIC GAMES, INC., | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) **FINAL JUDGMENT AND PERMANENT** ) **INJUNCTION ON CONSENT** ) |
| RONALD SYKES, | ) ) |
| Defendant. | ) ) |

Plaintiff Epic Games, Inc. ("Plaintiff" or "Epic") and Defendant Ronald Sykes ("Defendant" or "Sykes") (together, the "Parties") have reached an agreement to settle the above-captioned action, and have consented to the entry of this Final Judgment and Permanent Injunction on Consent (the "Consent Judgment") based on the following stipulated findings of fact and conclusions of law, which the Court hereby adopts for purposes of entry of this Consent Judgment.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1. This Court has proper jurisdiction over the subject matter in this litigation under 28 U.S.C. §§ 1331 and 18 U.S.C. § 1836(c) because this action arises under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, *et. seq*. (DE 1, Complaint ¶ 17) This Court has supplemental jurisdiction over Plaintiff's related state law claims under 28 U.S.C. § 1367(a).

2. This Court has personal jurisdiction over Defendant under N.C. Gen. Stat. § 1-75.4(1) because he is a natural person domiciled within this State and because he consented to the exclusive jurisdiction of courts located in this State. This Court also has personal jurisdiction over Defendant because he purposefully availed himself of the privileges of conducting activities

and doing business in the State of North Carolina and in this District, thus invoking the benefits and protections of North Carolina's laws. (DE 1, Complaint ¶ 18)

3. Venue is proper in this District under 28 U.S.C. § 1391(b) because this is a District in which a substantial part of the events giving rise to Plaintiff's claims occurred, and where a substantial part of the property that is the subject of this action was conceived, created, and is situated. It is also where Defendant committed acts of trade secret misappropriation and breached his contract, which was entered into in this District and is governed by North Carolina law, and where Plaintiff's injuries were suffered. (DE 1, Complaint ¶ 19)

4. Epic, a Maryland corporation with its principal place of business in Wake County, North Carolina, is the creator of the video game *Fortnite*® ("Fortnite"). Epic is the owner of all the intellectual property related to Fortnite, including, without limitation, the trade secrets described below. (DE 1, Complaint ¶¶ 15, 20-22, 34)

5. Fortnite was broadly released on July 25, 2017. Fortnite's free-to-play "Battle Royale" game mode was released on September 26, 2017. Since that time, Fortnite has become extremely popular in the United States and across the globe. With over 250 million accounts, it is played by millions of users and videos and livestreams of Fortnite gameplay are among most popular content on platforms like YouTube and Twitch. (DE 1, Complaint ¶ 21-22, 25-26)

6. An important part of Fortnite's dramatic success is the unexpected changes and surprises Fortnite's fans experience as the game, its story, and its environment continually evolve. This, along with the regular introduction of new content, including, without limitation, planned events; playing formats; themes; narratives; storylines; plot twists and developments; player capabilities; "emotes" (i.e., dances or gestures a player's avatar can perform); cosmetics (e.g., outfits aka "skins" for player avatars); weapons; vehicles; "Easter eggs;" new map locations, points of interest (POIs) and other environmental changes; and other secrets and

surprises, have kept Fortnite's millions of users excited about and engaged with the game. (DE 1, Complaint ¶ 27)

7. Epic is the owner of all right, title, and interest in and to the Fortnite-related proprietary, secret, and confidential business and technical information and data described in the Complaint (DE 1), specifically including its planned changes to Fortnite's map and environment that were made following the end of Fortnite Season X, (i.e., the new Chapter 2 map itself and its new map locations, points of interest, environmental features, such as rivers and the mountains shown on the picture of the map Defendant disclosed and otherwise described in the text of his tweets shown and described in the Complaint); new player capabilities (i.e., the ability to swim); new game features (i.e., weapon upgrade stations); a new vehicle (i.e., boats); a new weapon (i.e., bandage bazooka); new rules and reward system (i.e., Daily Medals awarded for searching chests, getting kills, and surviving); and new gameplay (i.e., new ways to get more powerful weapons and move around the new map by swimming and using boats in the riverways) (collectively with the trade secrets described in paragraphs 58 and 59 of the Complaint, "Epic's Trade Secrets"). (DE 1, Complaint ¶¶ 34, 58-59)

8. Epic invested considerable time, effort, and financial resources to develop and protect Epic's Trade Secrets, and Epic's Trade Secrets derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of Epic's Trade Secrets. (DE 1, Complaint ¶¶ 5, 35, 95)

9. At all relevant times, Epic took reasonable measures to keep Epic's Trade Secrets secret by, including, without limitation: (i) maintaining them in secure working spaces; (ii) requiring a fully executed NDA for each person who might have access to Epic's Trade Secrets; (iii) limiting access to Epic's Trade Secrets to only those who are working on Fortnite, are

3

product testers, or are part of senior management; (iv) requiring (a) an assigned Epic user name, (b) password (with leading-edge industry standards for password requirements), and (c) multifactor authentication to access the computer system in which Epic's Trade Secret-related files are stored and/or live-streamed meetings during which Epic's Trade Secrets might be discussed or disclosed; and (v) encrypting files that Fortnite users download in order to be able to play the game to prevent "data miners" from accessing the information. (DE 1, Complaint ¶ 37)

10. Epic's Trade Secrets derived economic value and competitive advantage from not being generally known. (DE 1, Complaint ¶ 81)

11. Defendant, an individual, is a citizen and resident of North Carolina. (DE 1, Complaint ¶ 16)

12. Defendant participated in Epic's User Experience Testing ("UX Testing") at Epic's headquarters on September 21, 2019. UX Testing allows testers access to versions of Fortnite that are still in development in exchange for their feedback and promise that they will keep what they learn secret. The purpose of UX Testing is to help Epic's developers improve Fortnite. (DE 1, Complaint ¶ 38)

13. Because participation in UX Testing involves access to Epic's confidential and proprietary information and trade secrets, Defendant was required to sign, and did sign in writing on September 21, 2019, a non-disclosure agreement ("his NDA" or "Defendant's NDA"), before he participated in the UX Testing. (DE 1, Complaint ¶ 39)

14. By signing his NDA, Defendant acknowledged that during UX Testing he might see, hear, be told, learn, obtain, and otherwise have access to proprietary, secret, and confidential information and data, including confidential information and trade secrets related to Epic's games (collectively "Confidential Information"). Defendant agreed to keep Epic's Confidential Information in strict confidence and not to use or disclose any of Epic's Confidential

4

Information. Defendant further agreed that, unless permitted otherwise in writing, he would not photograph or otherwise record any information, including Epic's Confidential Information, to which he might have access during UX Testing. (DE 1, Complaint ¶¶ 40-41, 42)

15. Under his NDA, Defendant agreed that Epic would provide him with "certain information that is confidential, proprietary, and not generally available to the public, and agreed that this confidential information provided by Epic was developed through substantial expenditures of time, effort, and money and constitutes valuable and unique property of Epic. (DE 1, Complaint ¶ 31, DE 11, Answer ¶ 31)

16. Defendant's NDA is a valid and binding agreement between Plaintiff and Defendant, supported by adequate consideration, in which Defendant agreed not to disclose Epic's Confidential Information and trade secrets. (DE 1, Complaint ¶¶ 46, 72)

17. On September 24, 2019—three days after he participated in the UX Testing—Defendant, styling himself "King Snipa" and using the handle "@snipa_king2K" on Twitter, wrote to another Twitter user, stated "I played S11 and can tell you the new stuff," and asked the other user to "dm" (i.e. send him a direct private message) for information about the then upcoming season of Fortnite. (DE 1, Complaint ¶¶ 50-51) As used in Defendant's messages, "S11" was a reference to "Season 11," which was thought to be the name of the then upcoming season of Fortnite. (*Id*.)

18. On September 28, 2019, Defendant, using the Twitter handle "@xDriFtZz," referred to the then upcoming season of Fortnite in a Tweet and claimed, "I played it, and season 11 is it!" (DE 1, Complaint ¶¶ 52-53)

19. On October 3, 2019, Defendant, using the alias @xDriFtZz, tweeted "bro you can swim season 11 just chill lol, season 11 will be great". (DE 1, Complaint ¶ 54)

5

PPAB 5264279v1
Case 5:19-cv-00476-FL   Document 7-1   Filed 12/10/19   Page 6 of 11

20. On October 5, 2019, Defendant, using the alias "@FNGzus" on Twitter, proclaimed himself "FortNews Gawd" and the "#1 Fortnite leaker," posted a series of highly detailed leaks about the then upcoming season of Fortnite. (DE 1, Complaint ¶ 55)

21. On October 5, 2019 at 12:18pm – nine days before it became public – Defendant "confirmed" on Twitter what the new map would be by posting an image of the as yet undisclosed map for the then upcoming season of Fortnite on Twitter. (DE 1, Complaint ¶ 56)

22. Then, beginning around 1:12pm on October 8, 2019, Defendant published 8 tweets in 7 minutes during which he revealed what he characterized as "Insider Season 11 Leaks & Info," including a number of very specific details and (again) an image of Fortnite's soon-to-be new map, which he said came from an "anonymous source" that had "information on the Season 11 Map, NEW CONTENT and what to expect" in Fortnite during the then upcoming season. (DE 1, Complaint ¶ 57) He also claimed that he had proof that this information came from "a reliable source that had an experience with the new season." (*Id.*)

23. On or about October 8, 2019 at 4:22am, Defendant began using the handle "@invisiblellama9" on Twitter and posted the image of the new map as a reply on the Twitter account of @Merl, a Fortnite streamer. (DE 1, Complaint ¶¶ 61, 64)

24. In these tweets and in his October 3 tweet, Defendant disclosed numerous details about the then upcoming season of Fortnite that were trade secrets which were not intended to be made public before October 15, 2019. (DE 1, Complaint ¶¶ 58-60, 62)

25. Defendant acquired Epic's Trade Secrets with knowledge that they were secrets that he was contractually obligated not to disclose. (DE 1, Complaint ¶ 98) In breaching these obligations, Defendant acquired Epic's Trade Secrets by improper means as defined under 18 U.S.C. § 1839(6).

26. Sykes' disclosure of Epic's Trade Secrets without Epic's express or implied authority or consent constitutes misappropriation of Epic's Trade Secrets under N.C. Gen. Stat. § 66-152(1).

27. Defendant' acquisition, disclosure, and use of Epic's Trade Secrets constitutes misappropriation of trade secrets in violation of both the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.* ("DTSA") and the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152, *et seq.*, ("NCTSPA") and violates the terms of Defendant's NDA.

28. Defendant's violations of the NCTSPA and DTSA, and North Carolina law have caused, and continue to cause, Epic great and irreparable injury that cannot be fully compensated or measured in money. Epic has no adequate remedy at law for Defendant's wrongful conduct because Epic's Trade Secrets are unique and valuable property that have no readily determinable market value and Defendant's misappropriation constitutes an interference with Epic's goodwill and customer relations. Accordingly, the Parties consent to the Permanent Injunction set forth below and enter into this Consent Judgment voluntarily after consulting with counsel and waive any rights to appeal from it.

It is hereby **ORDERED**, **ADJUDGED**, and **DECREED** that:

29. Defendant Ronald Sykes, along with his agents, representatives, partners, joint venturers, servants, employees, and all those persons or entities acting in concert or participations with him will immediately and permanently destroy any and all copies of any and all of Epic's Trade Secrets, Confidential Information, and other Epic trade secrets in his possession, custody, or control, including, without limitation, removing them from any place they are posted, and is **PERMANENTLY ENJOINED and RESTRAINED** from:

   a. Acquiring or seeking to acquire any of Epic's Trade Secrets, Confidential Information, or other Epic trade secrets;

b. Using any of Epic's Trade Secrets, Confidential Information, or other Epic trade secrets;

c. Disclosing any of Epic's Trade Secrets, Confidential Information, or other Epic trade secrets;

d. Inducing, assisting, or encouraging others in acquiring, using, or disclosing any of any of Epic's Trade Secrets, Confidential Information, or other Epic trade secrets;

e. Violating the terms of his NDA or any other contract with Epic that Sykes has entered into or enters into at any time in the future; or

f. Helping, inducing, or encouraging others to violate Epic's Terms of Service, the Fortnite End User License Agreement, or any other contract between Epic and any third party.

For the purposes of this paragraph 29 only, the term "Epic" includes all of Epic's subsidiaries and affiliated companies.

30. No bond or posting of security is required of the Parties in connection with the entry of this Consent Judgment.

31. Plaintiff and Defendant acknowledge that they have knowingly and voluntarily entered into this Consent Judgment after reviewing the same with their counsel or having had ample opportunity to consult with counsel. Plaintiff and Defendant understand the undertakings, obligations, and terms of this Consent Judgment.

32. Except as to Defendant's obligations set forth in this Consent Judgment and the Settlement Agreement between the Parties, Plaintiff's claims against Defendant in this Action are hereby dismissed <u>with prejudice</u>.

33. This Consent Judgment is final and Plaintiff and Defendant each hereby waive their rights to appeal from this order.

34. Nothing in this Consent Judgment precludes Plaintiff or Defendant from asserting any claims or rights that arise after Defendant's agreement to this Consent Judgment or that are based upon any breach of, or the inaccuracy of, any representation or warranty made by Defendant or Plaintiff in this Consent Judgment, or in the Settlement Agreement reached by the Parties.

35. Nothing in this Consent Judgment precludes Plaintiff or Defendant from asserting any claims or rights against any third party.

36. Defendant waives any objection under Federal Rule of Civil Procedure 65(d) (pertaining to injunctions).

37. This Court shall retain jurisdiction over this matter to enforce a violation of this Consent Judgment's terms. If any such violation occurs, the Court shall award, (a) without regard to proof of actual damages, liquidated damages of Ten Thousand Dollars ($10,000); as well as (b) injunctive relief enjoining any further breach of this Consent Judgment, or such modifications to the present Consent Judgment as the Court deems appropriate; (c) attorneys' fees, costs and disbursements, as determined by the Court; and (d) such other relief as the Court deems just and proper.

IT IS SO ORDERED this ____ day of _____, 2019.

_____
The Honorable Judge Louise W. Flanagan
United States District Judge

**CONSENTED TO:**

| **FOR THE PLAINTIFF:** | **FOR THE DEFENDANT:** |
|---|---|
| /s/Christopher M. Thomas | /s/ Thomas Kreger |
| Christopher M. Thomas (N.C. Bar No. 31834) | Thomas Kreger |
| Parker, Poe, Adams, & Bernstein LLP | Kreger Law Firm |
| PNC Plaza | 5003 Southpark Drive, Ste. 260 |
| 301 Fayetteville Street, Suite 1400 (27601) | Durham, NC 27713 |
| P.O. Box 389 | Telephone: (919) 794-5916 |
| Raleigh, North Carolina 27602-0389 | Facsimile: (888) 812-9380 |
| Telephone: (919) 835-4626 | Email: tkreger@kregerlawfirm.com |
| Facsimile: (919) 834-4564 | *Attorney for Defendant Ronald Sykes* |
| Email: christhomas@parkerpoe.com | |
| *Attorney for Plaintiff Epic Games, Inc.* | |